# AFFIDAVIT

I, Jody L. Harrison being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent with the United States Department of Homeland Security, Homeland Security Investigations (HSI), and have been employed by HSI as such since February, 2012. I have been a federal law enforcement officer for over twelve years in total with HSI and the United States Border Patrol. I have received extensive training and practical experience pertaining to federal criminal procedures, federal criminal statutes, United States Customs Laws and Regulations, and other federal and state laws pertaining, but not limited to, investigations of sex crimes, child exploitation, child pornography and computer crimes. I have been involved in investigations involving online solicitation/enticement of a minor. I have participated in investigations of persons suspected of violating federal child pornography laws, including Title 18, United States Code, Sections 2252 and 2252A. I have also participated in investigations of persons suspected of violating federal laws pertaining to the enticement of minors in violation of Title 18, United States Code, Section 2422(b). I have participated in various training courses for the investigation and enforcement of federal child pornography laws in which computers are used as the means for receiving, transmitting, and storing child pornography. Additionally, I have been involved in authoring and participated in the execution of search warrants involving searches and seizures of computers, computer equipment, software and electronically stored information. As part of my training and experience, I have reviewed images containing child pornography in a variety of formats (such as digital still images and video images) and media (such as digital storage devices, the Internet, and printed images).

2. This affidavit is submitted in support of an application for a search warrant for the place described in Attachment A (hereinafter "Subject Premises,"), and the computer(s) located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2422(b); 18 U.S.C. § 1958; and 18 U.S.C. § 2252A.

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations 18 U.S.C. § 2422(b); 18 U.S.C. § 1958; and 18 U.S.C. § 2252A are presently located at the Subject Premises.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTES

5. 18 U.S.C. § 2422(b) prohibits a person from using a means and facility of interstate or foreign commerce to knowingly attempt to persuade, induce, entice, or coerce an individual who has not attained the age of 18 years to engage in prostitution or any sexual activity for which any person could be charged with a criminal offense. It is a crime under Colorado Law to commit Sexual Assault, C.R.S. Section 18-3-402(1)(d). The attempted commission of such crime is also a violation of 18 U.S.C. § 2422(b).

6. 18 U.S.C. § 1958 prohibits any person to travel in or cause another (including the intended victim) to travel in interstate or foreign commerce, or use or cause another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the

laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value.

7. 18 U.S.C. § 2252A prohibits any person from distributing, receiving, or possessing any child pornography using any means or facility of interstate or foreign commerce or that has been mailed, or has been shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

8. The following definitions apply to this Affidavit and Attachment B to this Affidavit.

9. "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct).

10. "Visual depictions" includes prints, copies of visual images, developed and undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image See 18 U.S.C. § 2256(5).

11. "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

12. "IP Address" means Internet Protocol address, which is a unique numeric address used by computers on the Internet.  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

13. "Internet" means a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

14. In this affidavit, the terms "computers" or "digital storage media" or "digital storage devices" may be used interchangeably, and are intended to include any physical object upon which computer data can be recorded as well as all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices capable of performing logical, arithmetic, or storage functions, including desktop and laptop computers, mobile phones, tablets, server computers, game consoles, network hardware, hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical storage media.

## SEIZURE AND SEARCH OF COMPUTERS

15. As described above and in Attachment B, I submit that if computers or storage media are found at the Subject Premises**,** there is probable cause to search and seize those items for the reasons stated below.  Some of these electronic records might take the form of files, documents, and other data that is user-generated.  Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.  They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

2

16. For example, based on my knowledge, training, and experience, I know that a powered-on computer maintains volatile data. Volatile data can be defined as active information temporarily reflecting a computer's current state including registers, caches, physical and virtual memory, network connections, network shares, running processes, disks (floppy, tape and/or CD-ROM), and printing activity. Collected volatile data may contain such information as opened files, connections to other computers, passwords used for encryption, the presence of anti-forensic tools, or the presence of programs loaded in memory that would otherwise go unnoticed. Volatile data and its corresponding evidentiary value is lost when a computer is powered-off and unplugged.

17. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

18. Also, again based on my training and experience, wholly apart from user-generated files, computer storage media contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, virtual memory "swap" or paging files, and shadow copies of previous versions of systems or files, or paging files. Computer users typically do not erase or delete this evidence because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted, edited, moved, or show a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

19. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, why they were used, the purpose of their use, and the purposes to which they were put, who used them, the state of mind of the user(s), and when they were used.

20. The monitor and printer are also essential to show the nature and quality of the images or files that the system can produce. In addition, the analyst needs all assisting software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instructional manuals or other documentation and security devices. Moreover, searching computerized information for evidence or instrumentalities of crime commonly requires the seizure of the entire computer's input/output periphery devices (including related documentation, passwords and security devices) so that a qualified expert can accurately retrieve the system's data in a controlled environment.

21. The computer and its storage devices, the mouse, the monitor, keyboard, printer, modem and other system components are also used as instrumentalities of the crime to operate the computer to commit offenses involving the sexual exploitation of minors. Devices such as modems and routers can contain information about dates, IP addresses, MAC addresses, frequency, and computer(s) used to access the Internet or to

3

otherwise commit the crimes described herein. The computer equipment may also have fingerprints on them indicating the user of the computer and its components.

22. Information or files related to the crimes described herein are often obtained from the Internet or the cellular data networks using application software which often leaves files, logs or file remnants which would tend to show the identity of the person engaging in the conduct as well as the method of location or creation of the images, search terms used, exchange, transfer, distribution, possession or origin of the files. Files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

23. "User attribution" evidence can also be found on a computer and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. For example, your Affiant knows from training and experience that persons trading in, receiving, transporting, distributing or possessing images involving the sexual exploitation of children or those interested in the firsthand sexual exploitation of children often communicate with others through correspondence or other documents which could tend to identify the origin and possessor of the images as well as provide evidence of a person's interest in child pornography or child sexual exploitation. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

24. Your Affiant knows from training and experience that digital software or hardware exists that allows persons to share digital access over wired or wireless networks allowing multiple persons to appear on the Internet from the same IP address. Examination of these items can reveal information about the authorized or unauthorized use of Internet connection at the residence.

25. Searching computer(s) for the evidence described in the attachment may require a range of data analysis techniques. For example, information regarding user attribution or Internet use is located in various operating system log files that are not easily located or reviewed. Or, a person engaged in criminal activity will attempt to conceal evidence of the activity by "hiding" files or giving them deceptive names. As explained above, because the warrant calls for records of how a computer has been used, what it has been used for, and who has used it, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use a multitude of techniques, both on and off-scene, including more thorough techniques.

26. Furthermore, because there is probable cause to believe that the computer and its storage devices are all instrumentalities of crimes involving child exploitation, they should all be seized as such.

27. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques, that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment. These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

28. For example, the search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following on-site techniques (the following is a non-exclusive list, as other on-site search procedures may be used):

    A. On-site triage of computer systems to determine what, if any, peripheral devices or digital storage units have been connected to such computer systems, a preliminary scan of image files contained on such systems and digital storage devices to help identify any other relevant evidence or potential victims, and a scan for encryption software;

    B. On-site copying and analysis of volatile memory, which is usually lost if a computer is powered down, and may contain information about how the computer is being used, by whom, when, and may contain information about encryption, virtual machine software (virtual operating systems that are lost if the computer is powered down or encrypted),;

    C. On-site forensic imaging of any computers may be necessary for computers or devices that may be partially or fully encrypted, in order to preserve unencrypted electronic data that may, if not immediately imaged on-scene, become encrypted and accordingly unavailable for any examination.

29. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include off-site techniques since it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined off-site and in a controlled environment. This is true because of the following:

    A. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how, when and why a computer has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable. Also, because computer evidence is extremely vulnerable to tampering and destruction (both from external sources and from code embedded in the system as a "booby-trap"), the controlled environment of a laboratory may be essential to its complete and accurate analysis. Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

    B. The volume of evidence and time required for an examination. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to

5

    obtain evidence.  Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

    C. Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    D. Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

    E. Need to review evidence over time and to maintain entirety of evidence.  Your Affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. Your Affiant advises it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  Your Affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, your Affiant has reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, your Affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

30. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for permits both on-site seizing, imaging and searching, as well as off-site imaging and searching of storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant.  The examination may require techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

31. Because several people may share the Subject Premises as a residence, it is possible that the Subject Premises will contain computers that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## **BACKGROUND REGARDING THE INTERNET AND CHILD EXPLOITATION**

32. I have been formally trained in the investigation of crimes involving the sexual exploitation of children. I also own my own computer, have personal knowledge of the operation of a computer, and have accessed the Internet for numerous years. Based on this training and knowledge, and the experience of other law enforcement personnel involved in this investigation, I know the following:

33. Child pornographers can produce images using a wireless device such as a cell phone. Photos can also be made using cameras, then can be transferred onto another device either using wire or wireless technology. Images can also be uploaded to Internet-based storage commonly referred to as the "cloud." Hard-copy images can also be scanned into a computer. Via the Internet, connection can be made to literally millions of computers around the world. Child pornography can be transferred quickly and easily via electronic mail or virtually countless other online platforms, communication services, storage services, and applications.

34. A computer's capability to store images in digital form makes it an ideal repository for child pornography and other files related to the sexual abuse and exploitation of children. The digital-storage capacity in devices and in the "cloud" has grown tremendously within the last several years. Thumb drives with a capacity of 32 gigabytes are not uncommon. Flash cards with a capacity of 32 gigabytes are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. Phones with over 100 gigabytes in storage are not uncommon. Devices can store thousands of images and videos at very high resolution. These devices are often Internet capable and can not only store, but can transmit images via the Internet and can use the devices to store images and documents in internet or "cloud" storage spaces. Once this is done, there is no readily apparent evidence at the "scene of the crime". Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

35. With Internet access, a computer user can transport an image file from the Internet or from another user's computer to his own computer, so that the image file is stored in his computer. The process of transporting an image file to one's own computer is called "downloading". The user can then display the image file on his computer screen, and can choose to "save" the image on his computer and/or print out a hard copy of the image by using a printer device (such as a laser or inkjet printer). Sometimes the only method to recreate the evidence trail of this behavior is with careful laboratory examination of the computer, modem, printer, and other electronic devices.

36. Your Affiant knows from training and experience that search warrants of residences involved in computer or digitally related criminal activity usually produce items that tend to establish ownership or use of digital devices and ownership or use of any Internet service accounts accessed to obtain child pornography to include credit card bills, telephone bills, correspondence and other identification documents.

37. Your Affiant knows from training and experience that search warrants of residences usually reveal items that tend to show dominion and control of the property searched, to include utility bills, telephone bills, correspondence, rental agreements and other identification documents.

## INVESTIGATION

38. On April 26, 2019, a Task Force Agent (TFA) with HSI acting in an undercover (UC) capacity conducted an undercover investigation in an online website. The website is for persons who have an interest in death, torture, and killing. While in this website the UC received a private message from a person who has been identified as Danny James MCLAUGHLIN. During these conversations, MCLAUGHLIN used the screen names DANTWISTED and TWISTEDDAN. MCLAUGHLIN engaged the UC in conversation about raping and killing the UC's fictitious 13-year-old daughter. MCLAUGHLIN started the conversation by saying, "hello.. you want her snuffed do you." MCLAUGHLIN made the comment, "I however.. am fucking twisted.. and meant to do.. dark shit.." MCLAUGHLIN suggested that the UC take a dad/daughter trip and the daughter runs away and the UC never finds her. MCLAUGHLIN informed the UC that the two of them needed to work out the details and to plan it.

39. MCLAUGHLIN told the UC, "anyway as I see it.. you do like I suggested.. and given.. it's only you and her.. maybe a meeting. straight forward. I bind her.. and take her home with me.." and "we could make it.. like were old pals.. so she's not.. suspicious." The UC asked if MCLAUGHLIN only wanted to "snuff" the UC's daughter. MCLAUGHLIN replied, "hehe.. I think you know better. [Emoji face winking]."

40. The UC asked MCLAUGHLIN if he wanted to come to Florida to do it. MCLAUGHLIN told the UC to bring the daughter to MCLAUGHLIN in Colorado and that he is willing to "take her off [the UC's] hands." MCLAUGHLIN assured the UC that the UC would not see the daughter again. The UC asked MCLAUGHLIN if he was into children. MCLAUGHLIN replied, "well.. as I said. I have no limits.. and taking her.. would be a dream come true.. a captive teen.. just able to breed.. making her a rape toy.. and literally using her up."

41. MCLAUGHLIN indicated to the UC that MCLAUGHLIN believed the UC wanted to kill the daughter because the UC has had sex with the child and therefore wanted to "shut her up once and for all." MCLAUGHLIN suggested that he could help the UC to get free of the daughter if the UC helped MCLAUGHLIN get rid of his wife. MCLAUGHLIN told the UC, "I have a target.. for you.. and ideally.. you simply end it…" MCLAUGHLIN reasoned with the UC that if the UC killed his wife, MCLAUGHLIN would be free to have the UC's daughter. MCLAUGHLIN told the UC that he could not bring his wife to Florida and that the UC would need to come to Colorado to kill her. MCLAUGHLIN told the UC that it was a fair trade.

42. MCLAUGHLIN informed the UC that his wife attends a recurrent meeting at a particular location every Sunday morning at 8:00 a.m. and that the UC "simply grab and snap the neck." MCLAUGHLIN told the UC that ideally the UC would fly to Colorado and they could plan it. MCLAUGHLIN reassured the UC that he would take the UC's daughter saying, "…I really will take her.. and keep her.. for as long as she lasts.. you can visit and watch.." and "…I'm more than willing to take her.. keep her.. IF.. you freed me.."

43. MCLAUGHLIN told the UC that he could not travel, but if the UC travelled to Colorado to kill his wife then MCLAUGHLIN would be willing to "help with that cost." MCLAUGHLIN again informed the UC that the "convenient" time for the UC to kill his wife is Sunday mornings when she goes to her meeting.

44. MCLAUGHLIN sent via the Internet an image of child pornography to the UC to prove that he was not a cop. The image is of a female child approximately 9 to 12-years-old. The child is wearing a red tank top style shirt with a black garter belt and black nylon stockings. The child's legs are spread and is exposing her vagina to the camera.

45. On April 29, 2019, the UC reminded MCLAUGHLIN of the daughter's age twice during a conversation. During this conversation, MCLAUGHLIN assured the UC that he would "punish" and would "enjoy breaking" the UC's daughter. MCLAUGHLIN told the UC that he would make the UC's daughter a "rape toy." MCLAUGHLIN told the UC that he hopes the daughter "screams from anal" and asked how the daughter was "swallowing." MCLAUGHLIN informed the UC, "she will become 3 holes. beaten and

brused just to enjoy her sounds." MCLAUGHLIN also asked if the child was on birth control. MCLAUGHLIN asked the UC if he had checked on flights and asked about a timeline.

46. MCLAUGHLIN again mentioned that his wife attends a recurrent meeting on Sundays at 8:00 a.m. MCLAUGHLIN told the UC he could just dump his wife's body in the parking lot of the particular place she attends on Sundays. Later the same day, MCLAUGHLIN sent the UC an Internet link to a website where the UC could buy an 8 ounce bottle of Chloroform liquid. MCLAUGHLIN told the UC he was just "spitballing," but the UC could use Chloroform to "put [his wife] out for the drive."

47. Later the same day, the UC received an instant message from MCLAUGHLIN: "hope this works for us both. keep thinking of her as my captive rape toy. breaking her down to begging for me to put her down."

48. On April 30, 2019, the UC asked why MCLAUGHLIN did not just divorce his wife. MCLAUGHLIN responded to the UC by saying that he did not want to lose "the money, house and such…" MCLAUGHLIN offered the UC $3,000.00 to offset the UC's costs in killing his wife. MCLAUGHLIN informed the UC he would give him $1,300.00 as a cash advance. MCLAUGHLIN suggested that the UC buy a handgun and silencer when he was in Colorado and that MCLAUGHLIN would store it for the UC.

49. On May 1, 2019, MCLAUGHLIN sent the UC an address for a hotel where the UC could stay while the UC was in Colorado: "Hey (UC Name) this is not far from me so would work well.

50. Over several days MCLAUGHLIN and the UC had conversations planning for the UC and the UC's daughter to travel to Colorado. MCLAUGHLIN maintained his desire to take the UC's daughter and to have the UC kill his wife. MCLAUGHLIN and the UC arranged to meet in person, for MCLAUGHLIN to see the UC's daughter and discuss how to kill MCLAUGHLIN's wife. The date of the meeting was set for May 17, 2019.

51. On May 9, 2019, MCLAUGHLIN sent the UC a photograph of a white male standing outside of a log cabin. The male was wearing blue jean pants, a long sleeve shirt possibly gray in color with a blue baseball cap with writing on the front. In the window of the cabin there is a sign with the name "McLaughlin" engraved into the wood. MCLAUGHLIN said, "at my cabin I have a house too.;)"

52. On May 13, 2019, MCLAUGHLIN referred to the UC's daughter as "it" when MCLAUGHLIN said, "it becomes.. an it.. not what it was.. just to be used up.. enjoyed.." The UC replied, "yeah i'll hold my end up just hope this isn't a role play kinda thing for u." MCLAUGHLIN replied, "not at all.. promise…"

53. MCLAUGHLIN told the UC that he did not think his wife's body needed to be "dumped" anywhere. MCLAUGHLIN told the UC that his wife's body would be found eventually so he suggested, "that it's her.. is the freak thing.. like.. it's not unusual.. lately.. that someone gets shot here.. stabbed or what ever.." and "she becomes yet another victim.." MCLAUGHLIN said, "that's why I suggest.. maybe like a hand gun and silencer.. so you can do it.. quiet.. then drive off.."

54. The UC asked MCLAUGHLIN if the area of the wife's meeting location was crowded, MCLAUGHLIN said it wasn't too bad and was in a strip mall. MCLAUGHLIN informed the UC that she is there every Sunday. MCLAUGHLIN said, "she works from home.. so not away very often.. it's about the only predictable time and place." MCLAUGHLIN sent a web link (https://www.google.com/maps/@39.6254621,-105.0931102,193m/data=!3m1!1e3?hl=en)," to the particular location where his wife goes on Sundays. During this conversation MCLAUGHLIN said, that his wife just walked up while he was sending the web link to the UC. The UC asked MCLAUGHLIN if his wife was there with him at home while they were chatting. MCLAUGHLIN replied to the UC, "as I said.. she works from home.." This conversation verified that MCLAUGHLIN was present in his home at the time of the internet communications with the UC.

55. On May 14, 2019, HSI agents conducted surveillance of the Subject Premises. Parked in the front driveway of the Subject Premises, agents observed a 2001 blue Dodge Dakota extended-cab pickup bearing Colorado

license plate 355CSK. Record checks for this vehicle show that the registered owner is Danny James MCLAUGHLIN.

56. On May 17, 2019, the UC provided MCLAUGHLIN with his hotel location and MCLAUGHLIN arrived at the agreed upon location in Centennial, Colorado, where he encountered the UC. Upon encountering the UC, MCLAUGHLIN talked with the UC confirming he was the one who had been conversing with the UC. MCLAUGHLIN explained the reason why he wanted the UC to kill his wife. MCLAUGHLIN also told the UC he would take the UC daughter's off the UC's hands. MCLAUGHLIN described how he would keep the UC's daughter captive, chain her to a mattress, torture, cut, and rape the UC's daughter. MCLAUGHLIN told the UC he had experience molesting children, although MCLAUGHLIN refused to go into further details regarding that subject with the UC. MCLAUGHLIN also gave the UC one hundred dollars cash as a deposit with an agreement to pay the UC two additional separate payments, equaling a total of twenty-six hundred dollars. MCLAUGHLIN also acknowledged sending the image of child pornography to the UC. The entire encounter between UC and MCLAUGHLIN was audio and video recorded. MCLAUGHLIN was subsequently arrested.

57. MCLAUGHLIN was advised of his Miranda Rights, which he knowingly, intelligently, and voluntarily waived. MCLAUGHLIN agreed to speak with the HSI Special Agents. MCLAUGHLIN originally stated he had met the UC on a gaming site. HSI Special Agents advised MCLAUGHLIN that they had the conversations between MCLAUGHLIN and the UC. HSI Special Agents then showed MCLAUGHLIN the image of a male standing in front of a cabin that was sent to UC and MCLAUGHLIN acknowledged that it was a picture he sent to the UC of himself. HSI Special Agents read a portion of the communications between MCLAUGHLIN and the UC and MCLAUGHLIN admitted that he was the one who had those conversations with the UC, but claimed the content was all fantasy and role playing.

### **INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN AND CREATE, POSSESS, RECEIVE AND/OR DISTRIBUTE CHILD PORNOGRAPHY**

58. Based on my previous training and experience related to investigations involving child pornography and the sexual abuse of children, I have learned that individuals who create, possess, receive, distribute or access with intent to view child pornography have a sexual interest in children and in images of children. Based upon my knowledge, experience, and training in child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt and collection of child pornography:

   A. The majority of individuals who create and collect child pornography are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

   B. The majority of individuals who create and collect child pornography collect sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. The majority of these individuals also collect child erotica, which may consist of images or text that do not rise to the level of child pornography but which nonetheless fuel their deviant sexual fantasies involving children. Non-pornographic, seemingly innocuous images of minors are often found on computers and digital storage devices that also contain child pornography, or that is used to communicate with others about sexual activity or interest in children. Such images are useful in attempting to identify actual minors depicted in child pornography images found during the execution of a search warrant. In certain cases, such images may also assist in determining the origins of a particular child pornography image or series of images.

C. The majority of individuals who create and collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. They almost always maintain their collections in the privacy and security of their homes, cars, garages, sheds, and other secure storage locations, such as in a digital or electronic format in a safe, secure, and private environment, including in cloud-based storage online or on their person.

D. The majority of individuals who create and collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, e-mail, e-mail groups, bulletin boards, IRC, newsgroups, instant messaging, and other similar vehicles.

E. The majority of individuals who create and collect child pornography maintain books, magazines, newspapers and other writings, in hard copy or digital medium, on the subject of sexual activities with children, as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals rarely destroy these materials because of the psychological support they provide.

F. The majority of individuals who create and collect child pornography often collect, read, copy or maintain names, screen names or nicknames, addresses (including e-mail addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

G. Based upon training and experience, your Affiant knows that persons in engaged in the production and possession of child erotica are also often involved in the production and possession of child pornography. Likewise, your Affiant knows from training and experience that persons involved in the production and possession of child pornography are often involved in the production and possession of child erotica.

H. Based on my training, knowledge, experience, and conversations with others in law enforcement, I understand that an individual who possesses images and/or videos depicting child pornography on one digital storage devices and/or Internet email or online storage account is likely to possess child pornography on additional digital storage devices and/or Internet email or online storage accounts that s/he possesses. Additionally, based on this training and experience, I understand that an individual who discusses the sexual abuse and/or exploitation of children on one digital storage device is likely to conduct those communications on additional digital storage devices that s/he possesses.

## **CONCLUSION**

59. Based on the investigation described above, probable cause exists to believe that at the residence located at the place described in Attachment A, will be found evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 2422(b); 18 U.S.C. § 1958; and 18 U.S.C. § 2252A (described on Attachment B).

60. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/Jody L. Harrison*
Jody L. Harrison, Special Agent, HSI

SUBSCRIBED and SWORN before me this __17th__ day of __May__ 2019.

_____
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Julia Martinez and Ilianys Rivera Miranda, Assistant United States Attorneys.